1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BART P. HENSLEY,<br><br>          Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | Case No.  1:20-cv-01361-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF No. 19) |

## I.

### INTRODUCTION

Plaintiff Bart Henlsey ("Plaintiff" or "Hensley") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]

---

[1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to the undersigned magistrate judge for all purposes.  (ECF Nos. 9, 12, 13.)

Plaintiff suffers from lumbar and cervical degenerative disc disease, scoliosis, bilateral hip degenerative joint disease, and anxiety disorder.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

**II.**

**BACKGROUND**

**A.    Procedural History**

On March 9, 2018, Plaintiff filed a Title II application for disability insurance benefits, alleging a period of disability beginning on January 1, 2016.  (Admin. Rec. ("AR") 212–32, ECF No. 14-1.)[2]   Plaintiff's claim was initially denied on May 10, 2018, and denied upon reconsideration on July 12, 2018.  (AR 71–92, 93–122.)  On December 6, 2019, Plaintiff appeared before Administrative Law Judge Dennis LeBlanc (the "ALJ"), for an administrative hearing.  (AR 36–70.)  On December 31, 2019, the ALJ issued a decision finding that Plaintiff was not disabled because he could perform other jobs that existed in significant numbers in the national economy.  (AR 15–31.)  On July 30, 2020, the Appeals Council denied Plaintiff's request for review.  (AR 1–6.)

Plaintiff filed this action on September 24, 2020, and seeks judicial review of the denial of his application for disability benefits.  (ECF No. 1.)  On July 19, 2021, Plaintiff filed an opening brief.  (ECF No. 19.)  On September 8, 2021, Defendant filed a brief in opposition.  (ECF No. 21.)  On September 13, 2021, Plaintiff filed a reply.  (ECF No. 22.)

**B.    Hearing Testimony**

Plaintiff appeared and testified at the December 6, 2019 hearing with counsel.  (AR 40–65.)  Plaintiff was born on November 26, 1972, is unmarried, and lives with his father in a condominium.  (AR 41.)  Plaintiff graduated high school and completed vocational training in sales.  (AR 42.)  Plaintiff has a valid driver's license but only uses it to drive to the grocery store and doctor's appointments.  (AR 41–42.)  Plaintiff has not worked since 2015.  (AR 42.)

Plaintiff discussed several jobs he held from 2004 to 2015.  (AR 42–47.)  In 2007,

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

Plaintiff was self-employed and earned about $7,800.00 as a service manager at an independently-owned automotive repair shop.  (AR 46.)  His job duties included coordinating all sales and repairs for the shop and liaising between customers and repair workers.  (Id.)  In terms of amount of weight lifted, Plaintiff would "rarely" help push a car that wouldn't start.  (AR 47.)  Plaintiff spent approximately sixty percent of his job standing, and forty percent sitting.  (Id.)

In 2008, Plaintiff worked at Clovis RV, Inc., where he performed the same tasks as he did for Freedom Roads and James B. Tuck Enterprises ("JB Tuck") (described below).  (AR 46.)

Around 2011, Plaintiff worked at Insperity PEO Services, where Plaintiff worked as a door-to-door salesman of solar systems and coordinated the installations of the systems.  (AR 45.)  Plaintiff did not lift any items at this job, other than a clipboard.  (Id.)  Also in 2011, Plaintiff worked for Fresno Sports Management in direct sales.  (Id.)  Plaintiff sold ticket packages for the Fresno Grizzlies to customers.  (Id.)  Plaintiff did not lift or carry any weight at this job.  (AR 46.)  The job only required sitting.  (Id.)

Plaintiff worked for Freedom Roads as an assistant service manager/pre-delivery manager, and thereafter Plaintiff held a job as service manager for JB Tuck.  (AR 42–44.)  Plaintiff testified that his job duties at Freedom Roads and JB Tuck were identical.  (AR 44.)  Plaintiff's position at JB Tuck ended in September 2015; it was the last job Plaintiff held.  (AR 42–43, 47, 57.)

At JB Tuck, Plaintiff oversaw the day-to-day repairs and customer issues, relaying those issues between the customers and the service advisors and technicians, submitted warranty and sales reports, and completed the paperwork required to prepare RVs to be sold.  (AR 43.)  The heaviest weight Plaintiff had to lift was approximately thirty-five to forty pounds.  (AR 43–44.)  Plaintiff typically spent six hours standing and three to five hours sitting.  (AR 44.)

Plaintiff acknowledged his job at JB Tuck ended because he was laid off, and not due to his current medical condition.  (AR 47, 58.)  Plaintiff testified he would have been able to work in October 2015, and was looking for other jobs at that point.  (AR 58.)  But Plaintiff claims he has "an advancing issue" and has been unable to work since January 1, 2016, because of the chronic pain he experiences.  (AR 47, 58.)  More specifically, Plaintiff testified this pain starts at the bottom of his skull and "shoots" down his arms and lower back, through his glutes, legs, calves,

and feet.  (AR 47.)  Upon examination by the ALJ, Plaintiff testified he stopped looking for work around May 2016 and believed he was capable of working until that point.[3]  (AR 58–59.)

Plaintiff complained of constant, daily neck pain that radiated down his body.  (AR 48–49, 51.)  Plaintiff testified that medication would reduce his pain level to a four or five (out of ten) for about two hours, but that all activities except for sitting and walking during that time would aggravate his pain.  (AR 49.)  He could only sit for about fifteen to twenty minutes, then would have to stand up or his pain would increase to an eight.  (AR 49–50.)  He could only walk approximately fifteen feet before he would have to stop due to pain, and he could only stand for twenty-five to thirty minutes before he experienced back pain and muscle spasms.  (AR 50.)

Plaintiff testified that he experienced constant lumbar pain and was required to spend approximately three to three and a half hours stretching to moderate the pain.  (AR 52.)  He has difficulty sleeping because of his back pain.  (AR 53.)

Plaintiff stated he did physical therapy in the past but it didn't help.  (AR 48.)  Plaintiff also received steroidal injections; he testified that the first shot was "moderately successful" but "the rest of the shots . . . aggravated the pain."  (AR 48.)

Plaintiff testified he has carpal tunnel.  (AR 51.)  He estimated he is capable of lifting and carrying approximately five pounds, but would have difficulty lifting silverware or items with a handle, such as a milk carton or mugs, because he would experience pain from his wrist through his fingertips.  (AR 51, 56.)  He is only able to use his hands and fingers for tasks such as typing or folding clothes for fifteen minutes, and then he has to give them a break.  (AR 57.)  He is currently treating his carpal tunnel with Advanced Pain Management.  (AR 56.)

Plaintiff also indicated that he has arthritis.  (See id.)

Plaintiff testified he has an anxiety disorder and "other [unspecified] mental issues."  (AR 53.)  Plaintiff has been seen by a doctor for his anxiety since 2016.  (AR 63.)  He is currently being treated for his anxiety by his primary care physician.  (AR 53.)  Plaintiff takes medication for his anxiety that helps, but he testified he must be heavily sedated in order to alleviate the

---

[3] In light of this discussion, Plaintiff's counsel indicated he was not opposed to May 2016 being a potential amended onset date.  (AR 60.)

symptoms of an anxiety attack.  (Id.)  During an anxiety or panic attack,[4] Plaintiff testified he would experience racing thoughts, accelerated breathing, and chest pressure that would sometimes make him think he was going to stop breathing.  (AR 54.)  Plaintiff testified that social situations trigger his anxiety attacks.  (AR 54, 61.)  He is able to go to the grocery store if people assist him by carrying the groceries.  (AR 54.)

Plaintiff testified that his typical day consists of the following: Plaintiff experiences a panic attack between three and five in the morning, takes medication for it, and then tries to go back to sleep.  (AR 55.)  When Plaintiff wakes up, he sits at the edge of his bed until his muscles "get used to sitting up right" because movement is painful.  (Id.)  Plaintiff gets dressed, which causes mor pain, washes up, and drinks some coffee.  (Id.)  Throughout the day, Plaintiff does stretches and watches television, then he goes to bed.  (AR 55–56.)  Plaintiff takes three doses of medication throughout the day: one in the morning before coffee, one after eating lunch, and one after eating dinner.  (Id.)  Plaintiff's meals are all microwavable or pre-made meals received from friends because standing up long enough to prepare his own meals is painful.  (Id.)

Upon follow up questioning by the ALJ, Plaintiff testified that even if he didn't have any of the aforementioned physical conditions and only had to deal with his anxiety, he would still be unable to work, regardless of whether that job entailed dealing with customers or not.  (AR 61–62.)  Plaintiff further testified that, even though he previously only testified to experiencing panic attacks between three and five a.m., he also sometimes has panic attacks later in the day which are triggered by social interactions, such as "having to go to Thanksgiving," or general interactions with people.  (AR 62–63.)  However, Plaintiff additionally testified that, even on a day in which he did not have to socially interact with anyone, he might still have a panic attack.  (AR 63.)  A panic attack typically takes between thirty minutes to an hour and a half to subside.  (Id.)  Plaintiff would experience these non-morning panic attacks every other day, if not daily, and his anxiety was getting "worse" over time.  (See AR 63–64.)

The ALJ asked Plaintiff to explain why his March 2018 application does not make any

---

[4] Plaintiff, his counsel, and the ALJ appeared to use the terms "anxiety attack" and "panic attack" interchangeably during the December 6, 2019 hearing.

1    record or mention of anxiety; Plaintiff responded that any omission was unintentional. (AR 64.)

2    Plaintiff further testified that he has experienced the non-morning panic attacks "to varying

3    degrees for about ten years." (AR 65.) When questioned by the ALJ as to how he was able to

4    experience his panic attacks and still perform at his prior jobs, Plaintiff testified that he used to be

5    able to manage the attacks with medication and continue to "function" on the job, but the attacks

6    have become progressively worse, and the medication is less effective in controlling the attacks.

7    (Id.)

8         Finally, the ALJ asked Plaintiff why he did not file for disability until March 2018, even

9    though he claims his medical condition prevented him from working since May 2016; Plaintiff

10    testified that he thought he would get better but got worse instead. (See AR 64.)

11         Jenifer LaRue, a vocational expert ("VE"), also testified at the hearing. (AR 66–70.)

12    After discussing how the ALJ would like Plaintiff's prior work categorized, the VE found

13    Plaintiff's prior work to be service advisor, Dictionary of Occupational Titles ("DOT") 620.261-

14    018, light and skilled, SVP 7; door-to-door sales, DOT 291.357-010, light and unskilled, SVP 2;

15    and ticket sales, DOT 259.357-010, light and semi-skilled, SVP 3. (AR 67.)

16         The ALJ proffered a hypothetical of an individual of the same age, education, and work

17    experience as Plaintiff that could lift or carry ten pounds occasionally and five pounds frequently;

18    could stand or walk for two hours and sit for six hours out of an eight-hour workday; could not

19    perform any climbing, balancing, stooping, kneeling, crouching, or crawling; but would be

20    capable of frequent handling and fingering; would need to avoid exposure to any workplace

21    hazards such as dangerous machinery or unprotected heights; and would not be able to

22    communicate with members of the general public or to interact directly with them during the

23    workday. (AR 67–68.)

24         The VE opined that this individual could not perform Plaintiff's previous work. (AR 68.)

25    However, this individual could perform other sedentary, unskilled, SVP 2 jobs, such as: a stuffer,

26    DOT 731.685-014, for which there are 101,176 jobs in the nation; a lens inserter, DOT 713.687-

27    026, for which there are 72,538 jobs in the nation; and a document preparer, DOT 249.587-018,

28    for which there are 273,368 jobs in the nation. (Id.)

The ALJ proffered a second hypothetical in which the first hypothetical individual would also need to take an additional unscheduled break that was approximately thirty-minutes long, three times per week, that would take the individual off-task away from their work, and that could not be predicted or scheduled by the employer.  (Id.)  The VE opined that this individual could not perform any unskilled occupations on a competitive basis.  (AR 68–69.)

Plaintiff's counsel proffered a third hypothetical in which the individual had the same characteristics as the individual in the first hypothetical, except that the individual was limited to occasional manipulatives, including reaching in all directions, handling, and fingering.  (AR 69.) The VE opined that this individual could not perform any other work in the national economy. (Id.)

Plaintiff's counsel proffered a fourth hypothetical in which the individual again had the same characteristics as the individual in the first hypothetical, except that as a result of pain, the individual would be absent three days per month.  (Id.)  The VE opined that this individual could not perform any work.  (Id.)

### C.  The ALJ's Findings of Fact and Conclusions of Law

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

- Plaintiff has not engaged in substantial gainful activity since January 1, 2016, the alleged onset date.

- Plaintiff has the following severe impairments: lumbar and cervical degenerative disc disease, scoliosis, bilateral hip degenerative joint disease, and anxiety disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

- Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  He can lift or carry ten pounds occasionally and five pounds frequently; stand or walk for two hours of an eight-hour day; and sit for six hours

of an eight-hour day.  He can occasionally balance or stoop; but cannot climb, kneel, crouch, or crawl.  He can frequently handle and finger.  He should avoid workplace hazards, such as dangerous machinery or unprotected heights.  He is not able to communicate with members of the general public or interact directly with them during the workday.

- Plaintiff is unable to perform any past relevant work.
- Plaintiff is defined as a younger individual age 45–59, as of the alleged disability onset date.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not material to the determination of disability.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.
- Plaintiff has not been under a disability, as defined in the Social Security Act, from January 1, 2016, through the date of decision on December 31, 2019.

(AR 15–31.)

## III.

## LEGAL STANDARD

### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[5] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[6]

---

[5] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[6] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. §§ 416.901 et seq.  The

Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once he has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal

---

regulations are generally the same for both types of benefits.  Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §§ 404.1501 et seq.

decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines ("grids"), or call a vocational expert ("VE").  See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsbury, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' "  Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B.      2017 Regulatory Framework**

The Social Security Administration revised its regulations regarding the consideration of medical evidence — applying those revisions to all claims filed after March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).  Plaintiff filed his claim on March 9, 2018 (AR 234); therefore, the revised regulations apply.  See 20 C.F.R. § 404.1520c.

Under the updated regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."   20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Thus, the new regulations require an ALJ to apply the same factors to all medical sources when considering medical opinions.   See id.  Further, the regulations governing claims filed on or after March 27, 2017, no longer mandate particularized procedures that the ALJ must follow in considering opinions from treating sources (e.g., requirement that ALJ must 'give good reasons' for the weight given a treating source opinion).  See 20 C.F.R. § 404.1520c(b) (the ALJ "is not required to articulate how [he] considered each medical opinion or

1   prior administrative medical finding from one medical source individually.").

2          "When a medical source provides one or more medical opinions or prior administrative

3   medical findings, [the ALJ] will consider those medical opinions or prior administrative medical

4   findings from that medical source together using" the following factors: (1) supportability; (2)

5   consistency; (3) relationship with the claimant; (4) specialization; (5) other factors that "tend to

6   support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§

7   404.1520c(a), (c)(1)–(5).   The most important factors to be applied in evaluating the

8   persuasiveness of medical opinions and prior administrative medical findings are supportability

9   and consistency.  20 C.F.R. §§ 404.1520c(a), (b)(2).[7]  Accordingly, the ALJ must explain in his

10  decision how persuasive he finds a medical opinion and/or a prior administrative medical finding

11  based on these two factors.  20 C.F.R. § 404.1520c(b)(2).  However, the ALJ "may, but [is] not

12  required to, explain how [he] considered the [other remaining factors]," except when deciding

13  among differing yet equally persuasive opinions or findings on the same issue.  20 C.F.R. §

14  404.1520c(b)(2)–(3).  Further, the ALJ is "not required to articulate how [he] considered evidence

15  from nonmedical sources."  20 C.F.R. § 404.1520c(d).

16         **C.    Standard of Review**

17         Congress has provided that an individual may obtain judicial review of any final decision

18  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In

19  determining whether to reverse an ALJ's decision, the court reviews only those issues raised by

20  the party challenging the decision.  See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

21  Further, the Court's review of the Commissioner's decision is a limited one; the Court must find

22  the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C.

23  405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is relevant

24  evidence which, considering the record as a whole, a reasonable person might accept as adequate

25  to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten

26  ─────────────────
    [7] Regarding the supportability factor, the regulation provides that the "more relevant the objective medical evidence
27  and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more
    persuasive the medical opinions . . . will be."  § 404.1520c(c)(1).  Regarding the consistency factor, the "more
28  consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim,
    the more persuasive the medical opinion(s) . . . will be."  § 404.1520c(c)(2).

v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard). "[T]he threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." Thomas v. CalPortland Co., 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

# IV.

# DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred by: (1) failing to provide specific, clear, and convincing reasons for discounting Plaintiff's allegations of pain and physical dysfunction: and (2) failing to fully and fairly develop the medical opinion evidence of record. (ECF No. 19 at 4.) The Court addresses each argument in turn.

## A.    Whether the ALJ Provided Sufficient Reasons for Discounting Plaintiff's Allegations

Plaintiff contends the ALJ erred in discounting his testimony regarding his subjective symptoms and limitations. (ECF No. 19 at 4–11.) Defendant proffers that any one of the multiple bases from which the ALJ discounted Plaintiff's testimony would be sufficient to support the ALJ's finding. (ECF No. 21 at 12–16.)

### 1.    Relevant Medical Evidence

### a.    Antonio Villalvazo, MD

12

Plaintiff's medical records indicate he was regularly examined and treated by Dr. Villalvazo monthly in 2016 in 2017, and every month but July and December in 2018. (AR 317–85, 455–68, 499–529.) In 2019, Plaintiff was examined and treated by Dr. Villalvazo on January 28, March 28, April 29, May 28, and September 30, 2019. (AR 499–513.) These records indicate Plaintiff was principally seen for his hypertension. However, in addition to hypertension, Plaintiff was seen for a sinus infection on June 13, 2016 and August 29, 2018 (AR 335–37, 524–26); strep throat on February 15, 2018 (AR 464–66); hyperlipidemia on March 28, May 28, and September 30, 2019 (AR 499–502, 506–10); and anxiety on November 28 and October 26, 2018, and January 28, 2019 (AR 511–20).

Dr. Villalvazo conducted a general exam every visit that included examination of Plaintiff's general appearance, musculoskeletal system, extremities, neurologic and psych, and Dr. Villalvazo reviewed Plaintiff's symptomology with him, including musculoskeletal, neurologic and psychiatric symptoms. (AR 317–85, 455–68, 499–529.) Nearly every visit, Plaintiff denied all symptoms — including back pain, carpal tunnel, leg cramps, shoulder pain, joint pain, arm pain, hip pain, knee pain, ankle pain, muscle weakness, loss of use of extremities, tingling/numbness, headaches, anxiety, depressed mood, or difficulty sleeping. (See id.)

Starting on December 15, 2017, Plaintiff began complaining of back pain/lumbar spine pain, anxiety, and having difficulty sleeping. (AR 354–55, 455–68, 499–529.) Regardless of subjective complaints, every exam consistently yielded all normal results (e.g., Plaintiff appeared well developed, well nourished, and in no acute distress) — including normal cervical and lumbosacral spine, normal gait, full range of motion, and no swelling or deformity, and no clubbing, cyanosis or edema. (AR 317–85, 455–68, 499–529.) Of the thirty-nine exams Dr. Villalvazo conducted, he provided a fairly consistent assessment of Plaintiff: hypertension, anxiety, insomnia, and low back pain.[8] (See AR 317–85, 455–68, 499–529.) Dr. Villalvazo treated Plaintiff with medications only, which appear from the records to have been sufficient: Prochlorperazine Maleate, Omeprazole, Xanax, Norco, Famotidine, and Lisinopril.[9] (See AR

[8] On February 15 and March 23, 2018, Dr. Villalvazo also assessed Plaintiff with bronchitis. (AR 461–66.)

[9] On March 28, 2019, Dr. Villalvazo additionally prescribed added Zithromax z-pak (an antibiotic used to treat

13

1   317–85, 455–68, 499–529.)

2          Starting on May 24, 2018, Dr. Villalvazo began counseling Plaintiff on the dangers of

3   tobacco use, excessive alcohol intake, and dangers of illicit drugs (urging Plaintiff to quit

4   smoking on May 24, 2018); and the importance of eating a nutritious healthy food diet on a

5   regular basis and getting at least a few hours each week of moderate aerobic exercise.  (AR 499–

6   529.)  During Plaintiff's September 30, 2019 visit, Dr. Villalvazo reviewed lab results from

7   bloodwork and a urinalysis with Plaintiff: all valuations were within normal limits, except for

8   Plaintiff's glucose and cholesterol levels, and bilirubin in urinalysis.  (AR 499–502.)

9          The ALJ found the records of Dr. Villalvazo, dated January 15, 1016 through September

10  30, 2019, yielded consistently normal findings and that Plaintiff's treatment was limited to

11  medication management, including Norco for pain and Xanax for anxiety.  (AR 26 (citing AR

12  318, 321, 324, 327, 330, 333, 336, 339, 342, 345, 348, 351, 355, 358, 361, 364, 367, 370, 373,

13  375, 378, 382, 385, 456, 459, 461, 465, 467, 501, 504, 507, 510, 513, 516, 519, 522, 525, 528).)

14  The ALJ also noted Dr. Villalvazo's exams included examination of Plaintiff's cervical spine,

15  lumbar spine, and mental status.  (AR 26.)

16        **b.     Mohinder Poonia, MD, F.A.C.C., F.A.C.C.P.[10] (Fresno Cardiovascular Clinic)**

17         Plaintiff's medical records indicate he was examined and treated by Dr. Poonia during a

18  total of fourteen visits, occurring on October 30, November 17 and 21, and December 21, 2017;

19  January 22, February 22,[11] July 2, September 4, and November 5, 2018; and bi-monthly in 2019

20  on January 9, March 11, May 13, July 15, and September 16.  (AR 388–400, 477–96.)

21         Plaintiff's principal complaint to Dr. Poonia was for back pain, which was treated each

22  visit.[12]  (AR 388–400, 477–96.)  On November 21, 2017, and November 5, 2018, Plaintiff also

23
24  bacterial infections) and promethazine-DM syrup (used to treat common cold symptoms), which appear consistent
    with Plaintiff's documented sinus infections and presentiment of cold symptoms.  (AR 509–10.)
    [10] Fellow, American College of Cardiology; Fellow of the American College of Chest Physicians.

25
    [11] Duplicate records for this visit exist at AR 424–25, and 497–98.  For ease of reference, the Court shall refer to the
26  earliest notation in the record.

27  [12] During some visits, Plaintiff would additionally seek treatment regarding high lipids (AR 398–400 (Oct. 30,
    2017)), AR 495–96 (Jul. 2, 2018), AR 485–87 (Mar. 11, 2019)), AR 482–84 (May 13, 2019)); hypertension (AR
28  480–81 (Jul. 15, 2019)), AR 477–79 (Sept. 16, 2019)); shortness of breath and wheezing (AR 390–91 (Jan. 22,
    2018)); or sinus issues/cold symptoms (AR 488–90 (Jan. 9, 2019)), AR 485–87 (Mar. 11, 2019)).  On November 17,

complained of neck pain (AR 394–95, 491–92), and on February 22, 2018, Plaintiff additionally complained of joint pain (AR 388–89).  Dr. Poonia regularly conducted a general exam of Plaintiff which included the categories of back, extremities, musculoskeletal, joints, psych and neuro.  (See id.)  These examinations consistently yielded normal findings — generally: no acute distress; extremities: normal; back: no deformities of lumbosacral spine, thoraco-cervical spine normal, no deformities, movements normal, show normal range of motion; musculoskeletal: no swelling or deformities of hip joints, knee joints, ankle joints, shoulder joints, movements of all joints were within normal limits; psych: no signs of mental health disorder; joints: no swelling, local inflammation or joint deformities seen, movements at the lumbosacral spine and shoulders and knees and hips are within normal limits.  (See id.)  Dr. Poonia consistently treated Plaintiff with pain medication, including Ibuprofen and Naproxen, and advised Plaintiff on the benefits of healthy diet and exercise.[13]  (See AR 388–400, 477–96.)  At times, Plaintiff was also taking Cyclobenzaprine (a muscle relaxer).  (See AR 388–89, AR 477–96.)  The records additionally indicate Dr. Poonia declined to prescribe Plaintiff any anti-depressants, noting Plaintiff was "not [an] eligible candidate."  (See AR 388–400, 477–96.)

Dr. Poonia ordered an MR spine lumbar without contrast from Advanced Medical Imaging, which was taken on February 27, 2018.  (AR 404–06.)[14]  This MR was compared to a spine lumbar imaging taken November 17, 2017, which does not appear to be included in the objective medical evidence.  The impression provided was (1) congenitally short pedicles resulting in small central canal and small neural foramina; (2) mild disc bulge at L4-L5 resulting in minimal central canal stenosis; and (3) minimal narrowing of thecal sac at L3-L4.  (Id.)  Other findings revealed slight levoscoliosis at L3, no  disc bulge/herniation, no significant central canal stenosis or neural foraminal narrowing, and no evidence of bone marrow edema, fracture, or bone marrow replacing process.  (Id.)  On or around February 28, 2018, Dr. Poonia referred Plaintiff to

2017, Plaintiff complained exclusively of cold symptoms.  (AR 396–97.)  On December 21, 2017, Plaintiff complained of body aches, hypertension and headaches.  (AR 392–93.)
[13] At times, Plaintiff was also taking Lisinopril (blood pressure), Omeprazole and Pravacid (acid reflux, ulcers), Amoxicillin (bacterial infection), and Promethazine VC plain syrup (cold symptoms).  (See AR 388–89, 477–96.)

[14] Duplicate records for this visit exist at AR 420–22, 449–51, and 642–44.  For ease of reference, the Court shall refer to the earliest notation in the record.

Dr. Ky at Advanced Plain Solutions, who conducted an initial evaluation on March 19, 2018. (See AR 409–11.)  Thereafter, Dr. Poonia approved several requests from Dr. Ky for medications and treatment as detailed below.

The ALJ found the records of Dr. Poonia (Fresno Cardiovascular Clinic), dated from October 30, 2017 through September 19, 2019, also yielded normal findings and indicated Plaintiff's treatment was limited to medication for pain management including ibuprofen and cyclobenzaprine.  (AR 26 (citing AR 388–92, 394, 396, 398, 477–78, 480–83, 485–86, 488–89, 491–98 ).)  Dr. Poonia's exams included musculoskeletal and psychological testing.  (AR 26.)

**c.    Dr. Ky, D.O.[15] (Advanced Pain Solutions)**

Dr. Ky conducted an initial referral evaluation of Plaintiff on March 19, 2018, to assess Plaintiff's complaints of neck pain going down his arms and back pain going down his legs, then continued to treat Plaintiff through October 2019.  (AR 409–10, 413–18, 413–18, 430–42, 530–44, 547–637.)

At the March 19, 2018 initial evaluation, Plaintiff subjectively characterized his pain as "aching, burning, cramping, exhausting, heavy, sharp, shooting, splitting, stabbing, tender, throbbing, and tiring . . . numbness, tingling in upper limbs, changes in tissue texture, difficulties with activities of daily living, headaches, loss of range of motion, loss of sensation in the limbs, painful to light touch/air blowing along, and poor concentration."  (AR 413–14.)  This pain was exacerbated by "bending/flexing, bowel movement, cold, lying down on his back with straight legs, lying down on both sides, physical activities, physical therapy, pulling, pushing shopping cart, reaching overhead, sexual intercourse, prolonged sitting greater than fifteen minutes, sneezing/coughing, squatting, standing, tension, twisting, urination and walking."  (Id.)  Plaintiff reported that changing position often, heat, massage therapy and medications tended to alleviate pain, whereas trying activities modifications, home exercises regimen, and physical therapy did not relieve the pain.[16]  (AR 414–15.)

In particular, Dr. Ky's examination of Plaintiff yielded findings of abnormal posture with

---

[15] Doctor of Osteopathic Medicine.

[16] The Court notes no records of physical therapy are included in the record evidence.

mild flexion of the low back; mild tight band, mild spasm, mild hypertonicity and moderate tenderness along the bilateral cervical paraspinal muscles in the cervical spine; moderate tight band, moderate spasm, moderate hypertonicity and moderate tenderness in the lumbar spine; mild weakness on knee extension and ankle dorsiflexion of the right lower limb knee extension and ankle dorsiflexion of the left lower limb; and trace reflex at bilateral patellae and medial hamstrings.  (AR 416.)  Dr. Ky determined Spurling's maneuver was moderately positive at bilateral C5 and C6 for radicular symptomatology, and Valsalva's maneuver was positive for exacerbating pain.  (Id.)  The straight leg raise tested moderately positive along bilateral L4 and L5 at 25 degrees.  (Id.)  Plaintiff's lumbar spine range of motion limitations ranged from 25% to 50%.  (Id.)  At that time, Dr. Ky's "working diagnoses" included cervicobrachial syndrome, lumbar region radiculopathy, lumbar region intervertebral disc disorder with radiculopathy, lumbar region discogenic pain, lumbar facet arthropathy, kyphoscoliosis/scoliosis (idiopathic), cervical discogenic pain, cervical region radiculopathy, lumbago with right sciatica, and lumbago with left side sciatica.  (AR 409, 416–17.)  Dr. Ky recommended steroid injections at bilateral L4-L5 and right brachial plexus block with ultrasound guidance.  (AR 417–18.)  Dr. Poonia approved the epidural steroid injection on March 20, 2018.  (AR 429.)

Thereafter, Dr. Poonia approved Dr. Ky's recommendations for steroidal injections and nerve blocks for Plaintiff approximately every other month from 2018–2019: March 26, 2018 (AR 440–42 (nerve block to right brachial plexus)), May 9, 2018 (AR 430–32, 634–37 (nerve block to left brachial plexus)), July 30, 2018 (AR 619–23 (epidural steroid injections at bilateral L4-L5 and L5-S1)), September 10, 2018 (AR 610–13 (nerve block to right brachial plexus)), October 22, 2018 (AR 600–04 (epidural steroid injections at bilateral C4-C5 and C5-C6)), January 7, 2019 (AR 584–88 (lumbar facet nerve block injections at  bilateral L4-L5 and L5-S1)), and August 5, 2019 (AR 541–44 (right hip injection)).  After the first rounds of injections, Plaintiff reported "significant pain relief since receiving the treatment [that] lasted 10 days."  (AR 576–83, 589–99, 605–09, 614–18).

Starting on Plaintiff's December 10, 2018 visit, Dr. Ky prescribed Norco for pain.  (AR 589–94.)  Plaintiff received a new prescription of 90 tablets every month, with instructions to take

17

1   three tablets a day, as needed.  (AR 530–44, 547–83.)  Regarding Norco, Plaintiff "report[ed]

2   significant pain relief."  (See AR 559–83.)

3        On September 14, 2018, an MR spine lumbar without contrast was taken (signed by Frank

4   S. Chang, MD).  (AR 475–76, and 640–41.)  No comparison was used.  (Id.)  Findings of the

5   image included: bony alignment with no subluxation; fusion C5-C6 vertebra identified; no

6   compression deformity, bone marrow edema, or signal abnormality noted within the spinal cord;

7   no bulge or spinal stenosis at C2-C3; a small central disc protrusion at C3-C4, but no spinal

8   stenosis or neural foraminal encroachment; narrowing at C4-C5 disc space noted but no bulge,

9   protrusion, or central canal spinal stenosis; right lateral disc protrusion with right-sided moderate

10  spinal stenosis at C6-C7 with encroachment upon right C6-C7 neural foramen; and C7-T1 disc

11  intact.  (Id.)  Based on these findings, the following impressions were made: (1) C5-C6 fusion

12  changes; (2) mild disc bulge at the C4-C5 level but with no significant spinal stenosis; and (3)

13  C6-C7 right paracentral disc protrusion with moderate right-sided spinal canal stenosis and

14  encroachment on the right C6-C7 neural foramen.  (Id.)

15       During Plaintiff's July 8, 2019 visit, Dr. Ky recommended getting hip x-rays based on

16  Plaintiff's complaints of tenderness, and a follow up appointment was scheduled for July 20,

17  2019, to take the x-rays.  (AR 550, 552–53.)  It appears x-rays were taken on July 20, 2019 (see

18  AR 545–46), but the related report does not appear to be included in the record evidence.  Instead,

19  Plaintiff submits records pertaining to bilateral hip x-rays that were ordered by Perminder Bhatia

20  and taken on October 30, 2019.  (AR 661–64.)

21       On October 30, 2019, an MR Right hip without contrast was taken, as well as a left hip

22  MR.  (Id.)  The images were interpreted in conjunction with one another by Ivan Ramirez, MD,

23  and yielded the following impressions:  (1) focal linear high signal intensity along the right

24  chondrolabral junction of the superolateral labrum suspicious for a tear with no paralabral cyst,

25  with ligaments and tendons intact, within normal limits (AR 661–62); and (2) on left hip, gluteus

26  minimum minor insertional tendinopathy; and (3) questionable mild blunting on the anterior-

27  superior labrum compatible with fraying but no paralabral cyst and ligaments intact, within

28  normal limits (AR 663–64).

The records indicate all of Plaintiff's examinations with Dr. Ky consistently yielded results strikingly similar to those identified during the March 19, 2018 initial evaluation visit. (See AR 433–39, 530–40, 547–83, 589–99, 605–09, 614–18, 624–33.)  Plaintiff's lumbar and cervical range of motion measurements likewise fluctuated minimally between visits, remaining in the general range of 25%-50%.[17]  (See AR 433–39, 530–40, 589–99, 629–33.)  Plaintiff most frequently reported that, with medications, his pain was reduced to a two or three on a scale of ten.[18]  (See AR 433–39, 559–69, 576–83, 589–99, 605–09, 614–18, 624–33.)

The ALJ reviewed the records of Dr. Ky (Advanced Pain Solutions) in greater detail with respect to Plaintiff's February 27, 2018 lumbar spine scan (AR 404–08, 420–21, 449–50), his September 14, 2018 cervical spine scan (AR 475–76), and his October 30, 2019 hip scans (AR 661–65), noting the most serious impressions discussed, as reviewed above. The ALJ also noted Plaintiff's nerve block treatment on March 26, 2018 (AR 440), and other treatment consisting of medications and injections.  Comparing the findings between Plaintiff's March 19, 2018 initial evaluation (AR 415–16, 445–46) and his April 25, 2018 appointment (AR 434, 436–37), the ALJ concluded Plaintiff generally demonstrated the same abnormalities at his last visit to Advanced Pain Solutions as he did at his first visit.  (AR 26 (citing AR 532–33, 538–39, 550–51, 555–56, 562–63, 566–67, 571–72, 580–81, 591–92, 597–98, 605–06, 615–16, 626–27, 631–32).)   In particular, the ALJ noted Plaintiff reported that, when taking medications, his pain rated either a two or three.  (AR 26 (citing AR 559, 565, 576, 589, 595, 605, 614, 624, 629).)

### d.  State Agency Physician Opinions

On initial review, Plaintiff presented allegations of neck and back pain, high blood pressure, and arthritis.  (AR 74.)  On May 10, 2018, Dr. Fast provided a medical evaluation of Plaintiff at the initial level of review.  Dr. Fast reviewed medical records from Advanced Medical

---

[17] Outlier measurements occurred on July 5, 2018, when Plaintiff's lumbar range of motion yielded an extension limited by 60%, August 23, and September 25, 2018, when Plaintiff's lumbar range of motion test yielded a flexion limited by 60%, and July 8, 2019, when Plaintiff's lumbar range of motion yielded an extension limited by 60% and left rotation limited by 70%.  (AR 547–53, 605–09, 614–18, 624–28.)

[18] At Plaintiff's March 19, 2018 initial evaluation visit with Dr. Ky, he reported pain with medications was a four on a scale of ten.  The aforementioned summary does not represent office visits after June 4, 2019, as it appears Plaintiff stopped providing an estimated pain level with medications.  Nonetheless, the Court notes Plaintiff continued to refill his Norco prescriptions at all of these visits.

Imaging, Fresno Cardiovascular Clinic, Advanced Pain Solutions, Plaintiff's pain questionnaire, and 5002 ROC and concluded Plaintiff's impairments included severe curvature of the spine and non-severe essential hypertension and migraine; but Plaintiff's individual statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence and were only partially consistent with the evidence; Plaintiff's allegations were not at the frequency or severity to be listing level; and the objective evidence was not at listing level.  (AR 74–76.)  Dr. Fast determined the medical evidence did not establish a disability; and Plaintiff should be capable of light RFC.  (AR 75–80.)  This included occasionally lifting/carrying/pulling twenty pounds, frequently lifting/carrying/pulling ten pounds, standing/walking and sitting about six hours in an eight-hour day, and unlimited push and pull capacity.  (AR 77.)

On reconsideration, Plaintiff alleged his overall health "worsened" in 2018 but did not identify any new conditions.  (AR 94, 277.)  Dr. Wong reviewed and summarized Plaintiff's records from Advanced Medical Imaging, Fresno Cardiovascular Clinic, Advanced Pain Solutions, and Dr. Villalvazo and concluded the RFC light was still applicable.  (AR 95–106.) The impairments Dr. Wong identified included severe curvature of spine, non-severe essential hypertension, and non-severe migraine and anxiety/obsessive-compulsive disorders.  (AR 100.) Dr. Wong found Plaintiff was stable with medications, there was no evidence of additional injury or decompensation, and the additional medical records did not alter that conclusion.  (AR 99–100.)  Dr. Wong determined the same exertional limitations, and found Plaintiff could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  (AR 102–03.)  Dr. Collado's conclusions were similar to Dr. Wong's, noting Plaintiff should avoid concentrated exposure to hazards and avoid uneven terrain.  (AR 115.)

Plaintiff submitted over 100 pages of additional medical records with his request for an ALJ hearing.  (AR 151–52.)  In light of Dr. Ky's additional medical records produced after the July 2018 administrative findings were issued, the ALJ found the administrative findings of Drs. Fast, Collado, and Wong to be unpersuasive.  (AR 28 (citing AR 71–80, 82–91, 93–121).)  Thus, the ALJ determined that Plaintiff was more limited than was assessed by Drs. R. Fast, J. Collado,

1  and E. Wong.  (AR 28.)

2         2.      Plaintiff's Subjective Complaints

3         In his application for SSI, Plaintiff alleged he experienced neck pain, back pain, high

4  blood pressure, and arthritis.  (AR 213, 253.)  Plaintiff alleged he stopped working on September

5  1, 2015 because of his conditions.  (AR 253.)  He indicated he had future appointments schedule

6  for his physical conditions but not his mental/emotional conditions.  (AR 256.)  Plaintiff attached

7  multiple pages to his pain questionnaire.  (AR 263–71.)  He indicated he is able to drive his own

8  car, cook, and run errands such as going to the grocery store or post office without assistance, but

9  requires assistance with housekeeping such as dusting.  (AR 265.)  Plaintiff alleges he was

10 diagnosed with scoliosis when he was thirteen and experienced back, neck, shoulder and leg pain

11 in his early teens when he completed strenuous activities and sometimes needed to stay home

12 from school "after overdoing activities."  (AR 266.)  At seventeen, Plaintiff took x-rays which

13 allegedly showed he had damaged vertebrae, scoliosis, and one leg longer than the other, causing

14 Plaintiff's hips to be unaligned.  (Id.)  In his twenties and thirties, Plaintiff alleges back pain and

15 difficulty walking, resulting in visits to urgent care for his back, neck, and shoulder pain.  (Id.)

16 Nearing his forties, Plaintiff alleged worsened pain.  (Id.)  Plaintiff alleges his pain began to

17 prohibit him from daily activities starting November 1, 2015 and in early 2016 the pain in

18 Plaintiff's neck, back, shoulders, arms, hands and legs was "extreme pain."  (Id.)  Plaintiff also

19 claims he did not have insurance and could not afford treatment and did not realize he qualified

20 for Medi-Cal until an unspecified date, therefore he lacks documentation of treatment.  (AR 267.)

21 Much of Plaintiff's pain questionnaire allegations are mirrored in his testimony previously set

22 forth.  (See AR 267–71.)  Plaintiff additionally alleges he suffers muscle inflammation; migraine

23 headaches due to his neck pain; and sometimes wakes up in the middle of the night and his arm,

24 hand, or leg is numb.  (Id.)  Plaintiff alleges he is in constant pain, but sometimes it is to a lesser

25 degree.  (AR 268.)  His pain medications seem to lessen the pain; Plaintiff also wears a back

26 brace, uses a TENS machine, heating pad, and icy hot, and performs frequent stretches to relieve

27 pain.  (AR 268–70.) Plaintiff alleges he cannot sit down or stand up for extended periods of time,

28 engage in "extended meal preparations," or take long car trips, walks, or bike rides, and plays his

guitar "much less."   (AR 270–71.)   Plaintiff claims his doctors informed him he has eight herniated discs in his back and neck, abnormal disc fusion in his neck, arthritis, tendonitis, and carpal tunnel syndrome, dislocated hips, that he is resistant to treatment (i.e., radiofrequency, shots), and his constant pain requires pain medication.  (AR 305.)

> 3.  Relevant Law

The ALJ is responsible for determining credibility,[19] resolving conflicts in medical testimony and resolving ambiguities.  Andrews, 53 F.3d at 1039.  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); S.S.R. 16-3p; see also Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

The Ninth Circuit has required an ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.[20]  Burrell v. Colvin, 775 F.3d 1133, 1136

---

[19] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

[20] District courts in this circuit have observed that it is not clear whether the Ninth Circuit precedent requiring "clear and convincing reasons" remains viable in light of the new regulations (as previously set forth more fully).  See Allen T. v. Saul, No. EDCV 19-1066-KS, 2020 WL 3510871, at *3 (C.D. Cal. June 29, 2020) ("It remains to be seen whether the new regulations will meaningfully change how the Ninth Circuit determines the adequacy of an ALJ's reasoning and whether the Ninth Circuit will continue to require that an ALJ provide 'clear and convincing' or 'specific and legitimate reasons' in the analysis of medical opinions, or some variation of those standards.").

(9th Cir. 2014); see also S.S.R. 16-3p at *10.  Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  Burch, 400 F.3d at 680–81; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5.  Additional factors an ALJ may consider include the claimant's daily activities; the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct — such as daily activities, work record, or an unexplained failure to pursue or follow treatment — as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Smolen, 80 F.3d at 1284.

4.    Analysis

As previously noted, the ALJ concluded the medically acceptable evidence — including

---

California district courts appear to have generally found that Ninth Circuit precedent delineating the deference due to physician opinions does not survive the new regulations because those cases relied on the "treating source rule" in the prior version of the regulations.  See, e.g., Kathy Jean T. v. Saul, No. 20cv1090-RBB, 2021 WL 2156179, at *5 (S.D. Cal. May 27, 2021) ("This measure of deference to a treating physician is no longer applicable under the 2017 revised regulations."); Jones v. Saul, No. 2:10-cv-01273 AC, 2021 WL 620475, at *6 (E.D. Cal. Feb. 17, 2021) (finding the revised regulations valid, entitled to deference, and supersede prior Ninth Circuit case authority interpreting the treating physician rule); see Revisions, 82 Fed. Reg. 5844-01, 5853, 2017 WL 168819 ("[W]e are not retaining the treating source rule . . . for claims filed on or after March 27, 2017.").  As a general matter, this Court must defer to the new regulations, even where they conflict with prior judicial precedent, unless the prior judicial construction "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  See Allen T., 2020 WL 3510871, at *3 (C.D. Cal. Jun. 29, 2020) (quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981–82 (2005)).

signs, symptoms, and laboratory findings — supported the finding that Plaintiff has severe impairments of lumbar and cervical degenerative disc disease, scoliosis, and bilateral hip degenerative joint disease.[21]   (AR 20.)   However, although Plaintiff's impairments resulted in some functional limitations, the ALJ determined Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his impairment/s were not fully consistent with or supported by the record.  (AR 25–28.)

Plaintiff disputes the ALJ's determination based on (a) lack of objective medical evidence, (b) no invasive treatment during the relevant period, (c) medications were effective, and (d) poor work history.

### a.    Lack of Objective Medical Evidence

Ninth Circuit case law has consistently affirmed ALJs' reliance on objective evidence as a factor for rejecting symptom allegations.  Burch, 400 F.3d at 681 (affirming the ALJ's rejection of symptom allegations for being inconsistent with objective imaging).

The ALJ found examinations from Drs. Villalvazo and Poonia yielded consistently normal findings, whereas Plaintiff presented with some abnormalities only with Dr. Ky.  (AR 27.)  Nonetheless, the ALJ concluded Dr. Ky's records also did not entirely support Plaintiff's allegations.  (AR 26–27.)  In support of his finding that the medical record did not support Plaintiff's allegations, the ALJ specifically noted the radiographic records indicated the presence of predominantly mild abnormalities, Plaintiff's gait is unaltered despite his flexed spine, the range of motion deficits in Plaintiff's spine have been at fifty percent or less, and Plaintiff's deficits with strength, reflex, and sensation were typically no more than mildly affected; also the ALJ noted Plaintiff did not present with any significant mental deficits, either due to his underlying psychological or physical impairments (e.g., pain distraction).  (AR 27.)

Plaintiff raises several objections with respect to the ALJ's objective medical findings.  First, Plaintiff contends that the ALJ was required to articulate "specific, clear, and convincing

---

[21] The ALJ also determined Plaintiff's anxiety disorder constituted a severe impairment.  However, Plaintiff does not submit any arguments with respect to his alleged mental health disability; therefore, the Court shall not further address it herein, except to note the ALJ considered Plaintiff's anxiety disorder individually and in combination with the other identified impairments to determine whether Plaintiff had an impairment or combination of impairments sufficiently severe to meet the criteria listings under 20 C.F.R. §§ 404.1520(d) et seq.  (See AR 22.)

reasons."  This argument is unavailing.  The "treating source rule" allowed an ALJ to reject a treating or examining physician's uncontradicted medical opinion only for "clear and convincing reasons," and allowed a contradicted opinion to be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  See, e.g., Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017).  However, as noted above, the revised regulations no longer use the term "treating source," but instead use the phrase "your medical source(s)" to refer to whichever medical sources a claimant chooses to use.  See 20 C.F.R. §§ 404.1520c, 416.920c; Revisions, 82 FR 5844-01, 2017 WL 168819, at *5852–53 (eliminating "treating source rule").  In sum, the requirement that an ALJ provide "clear and convincing" or "specific and legitimate" reasons for discounting a treating or examining opinion no longer applies, as this "measure of deference to a treating physician is no longer applicable under the 2017 revised regulations."  Kathy Jean T., 2021 WL 2156179, at *5; Jones, 2021 WL 620475, at *6; Allen T., 2020 WL 3510871, at *3.  Therefore, to the extent Plaintiff argues the ALJ improperly discounted his pain testimony because he failed to articulate specific and legitimate reasons supported by substantial evidence in determining the persuasive value of the opinions of Drs. Villalvazo, Poonia and Ky, Plaintiff's argument is without merit.  Nonetheless, the Court notes that Plaintiff's arguments, although based on the treating source rule, are still capable of analysis under the new regulations.[22] Accordingly, the Court will address the ALJ's evaluation of any differing medical opinions under the 2017 regulations.

Next, Plaintiff takes issue with the ALJ's finding that the opinions of Drs. Villalvazo and

---

[22] The new regulations still require the ALJ to explain his reasoning and to specifically address how he considered the supportability and consistency of the opinion.  20 C.F.R. §§ 404.1520c, 416.920c; see P.H. v. Saul, No. 19-cv-04800-VKD, 2021 WL 965330, at *3 (N.D. Cal. Mar. 15, 2021) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he] considered the medical opinions' and 'how persuasive [he] find[s] all of the medical opinions.") (citation omitted).  As always, the ALJ's reasoning must be free of legal error and supported by substantial evidence.  See Ford, 950 F.3d at 1154.  Indeed, the Court notes that, where an ALJ's rationale for rejecting a contradicted treating physician's opinion satisfies the new regulatory standard, it would almost certainly pass scrutiny under the old standard as well.  See Andrews, 53 F.3d at 1041 (noting that inconsistency with independent clinical findings in the record is a specific and legitimate reason to reject a contradicted opinion of a treating physician).  Thus, even under the new regulatory framework, the Court still must determine whether the ALJ adequately explained how he considered the supportability and consistency factors relative to medical opinions and whether the reasons were free from legal error and supported by substantial evidence.  See Martinez V. v. Saul, No. CV 20-5675-KS, 2021 WL 1947238, at *3 (C.D. Cal. May 14, 2021).

Poonia had more persuasive value than those of Dr. Ky.  Plaintiff argues the ALJ's reliance on Dr. Villalvazo and Dr. Poonia's records indicating normal findings was misguided because they are not based on a thorough evaluation of Plaintiff's back, neck, and extremities; rather, Dr. Villalvazo's notes pertain to Plaintiff's hypertension (citing AR 27, 317–52, 354–85, 455–68, 499–529), and Dr. Poonia's notes contain few details regarding Plaintiff's musculoskeletal functioning (citing AR 388–400, 477–98).  (ECF No. 19 at 6.)  Plaintiff also argues the notes of these doctors appear to be summary findings copied from each treatment session.  (Id.)  Instead, Plaintiff argues the ALJ should have placed greater weight on the records from Dr. Ky, which "provided objective support of Plaintiff's pain symptoms," because they were more detailed with respect to Plaintiff's neck and back pain (citing AR 415, 437, 532, 538, 555, 566, 571, 580, 591–92, 598, 606, 615, 626), more recent in time, (spanning from March 2018 to October 2019), and more relevant because Dr. Ky, as a pain management specialist, was in a better position to evaluate the extent of Plaintiff's physical dysfunction and resulting symptoms (citing AR 416, 437, 533, 539, 550, 556, 562–63, 567, 572, 580–81, 591–92, 597–98, 607, 616, 626–27, 641, 662–64).  (ECF No. 19 at 7–8; AR 409–18, 430–48, 530–60.)  The Court finds these arguments unpersuasive.

As an initial matter, Plaintiff misconstrues the ALJ's opinion.  The Court does not find the ALJ's discounting of Plaintiff's allegations "concerning the intensity, persistence, and limiting effects of [the symptoms caused by the identified impairment/s]" because they "are not entirely consistent with" or supported by the record (AR 25) signifies the ALJ also discounted Dr. Ky's opinion.  Cf. Ghanim, 763 F.3d at 1162 ("If a treating provider's opinions are based to a large extent on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion") (internal citation omitted).  To the contrary, it is plain that the ALJ did not reject Dr. Ky's opinion or records: the ALJ found the administrative findings of Drs. Fast, Collado, and Wong to be unpersuasive based on his review of over a hundred pages of medical records from Dr. Ky.  (AR 28.)  Indeed, the ALJ determined that Plaintiff was more limited than previously assessed by Drs. Fast, Collado, and Wong because of the ALJ's reliance on Dr. Ky's records.  (Id.)  Nor does it appear to the Court

1  that the ALJ placed significantly greater weight on the opinions of Drs. Villalvazo and Poonia

2  than Dr. Ky.  The ALJ noted Drs. Villalvazo and Poonia's records were internally consistent, and

3  it is clear he accorded some weight to their opinions, based on the statement that "two of three

4  facilities with which the claimant has sought care have yielded consistent normal findings."  (AR

5  27.)  Yet, even where the ALJ noted Dr. Ky's records (as the third facility) "presented . . . some

6  abnormalities," the ALJ nevertheless placed substantial weight on Dr. Ky's assessments; this is

7  apparent from the ALJ's determination that Plaintiff has severe impairments of lumbar and

8  cervical degenerative disc disease, scoliosis, and bilateral hip degenerative joint disease —

9  impairments that are consistent with Dr. Ky's diagnoses.  (AR 20; see also AR 416–17.)

10       Further, Plaintiff misconstrues the record.  But for the month of October 2019, Dr. Ky's

11  records cannot be said to be more recent than the other doctors, as both Dr. Villalvazo and Dr.

12  Poonia continued to regularly examine and treat Plaintiff through September 2019.  (See AR 317–

13  85, 388–400, 455–68, 477–96, 499–29.)  Nor does the medical record support a conclusion that

14  Dr. Villalvazo and Dr. Poonia's general examinations were less relevant because of the doctors'

15  specialties.  Plaintiff presents no evidence that either doctor was incompetent or incapable of

16  conducting a general examination of Plaintiff during each visit and reporting their findings.  The

17  medical records show Dr. Villalvazo and Dr. Poonia conducted general examinations of Plaintiff

18  at the time of every appointment, and these examinations included a review of Plaintiff's

19  symptomology, including the back, extremities, musculoskeletal system, and joints.  (AR 317–85,

20  388–400, 455–68, 477–96, 499–529.)  Plaintiff had the opportunity to assert his complaints of

21  pain and other symptoms to Dr. Villalvazo and Dr. Poonia (regardless of whether he declined to

22  do so), and such observations were duly recorded.  Further, Plaintiff indicates on his application

23  that Dr. Villalvazos treated him for his back condition and opined diagnoses that included low

24  back pain, and Fresno Cardiovascular Clinic treated Plaintiff for "all conditions"; Dr. Poonia

25  opined a diagnoses of dorsalgia, among others, and treated Plaintiff for back, neck, and joint pain,

26  among other conditions.  (AR 278–80, 314.)  Thus, Plaintiff's arguments are belied by the

27  medical records.

28       Additionally, the Court rejects Plaintiff's argument that the records appear to be

"summary findings copied from each treatment session," as the exact same argument could be made with respect to the examination notes recorded by Dr. Ky.  (Compare, generally, AR 317–85, 388–400, 455–68, 477–96, 499–529 with AR 409–10, 413–18, 413–18, 430–42, 530–44, 547–637.)  Therefore, to the extent the ALJ accorded weight to the records of Dr. Villalvazo and Dr. Poonia, in addition to Dr. Ky's records, the Court finds no legal error.  In sum, the ALJ's analysis addressed persuasiveness, including supportability and consistency, and that analysis is supported by substantial evidence in the record.  See Robert S. v. Saul, No. 3:19-cv-01773-SB, 2021 WL 1214518, at *5 (D. Or. Mar. 3, 2021), report and recommendation adopted, 2021 WL 1206576 (D. Or. Mar. 29, 2021).

Finally, Plaintiff argues the ALJ erred in finding that Dr. Ky's medical records do not fully support Plaintiff's pain allegations because the ALJ failed to identify the specific conflicts between the records and Plaintiff's reported symptoms.  (See ECF No. 19 at 6–8.)  This assertion is clearly contradicted by the record itself.  For example, the ALJ summarized Plaintiff's allegations regarding neck pain, back pain, high blood pressure, arthritis, and other issues, and identified numerous specific, clinical findings in the record with which Plaintiff's statements were inconsistent.  (ECF No. 21 at 13–14; compare AR 532–33, 538–39, 550–51, 555–56, 562–63, 566–68, 571–72, 580–81, 591–92, 597–98, 606–07, 615–16, 626–27, 631–32 (mild tightness, moderate cervical tenderness, reduced cervical ROM, reduced lumbar ROM) with AR 318, 321, 324, 327, 330, 333, 336, 339, 342, 345, 348, 351, 355, 358, 361, 364, 367, 370, 373, 376, 379, 382, 385, 477–78, 480–81, 482–83, 485–86, 488–89, 491–92, 493–94, 495–96, 497–98, 501, 504, 507, 510, 513, 516, 519, 522, 525, 528 (normal examinations).)  In light of these inconsistencies, the ALJ did not err in discrediting plaintiff's subjective testimony.

**b.      No Invasive Treatment During the Relevant Period**

Evidence that a claimant's medical treatment was relatively conservative may properly be considered in evaluating a claimant's subjective complaints.  See Tommasetti, 533 F.3d at 1039–40; Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).  ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted); see also Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of treatment in

1   his credibility determination.").

2         Here, the ALJ noted Plaintiff's prescribed treatment regimen has been limited to

3   medication management and pain management techniques, including injection therapy and

4   radiofrequency ablation, and that Plaintiff required no invasive treatment (other than one instance

5   occurring prior to the alleged onset date of disability) as a basis for discounting Plaintiff's

6   subjective allegations.  (AR 27.)

7         Plaintiff takes issue with the ALJ's characterization of his treatment — which included

8   opioid pain medication, nerve block injections, and epidural steroid injections — as

9   "conservative"; whereas, Plaintiff argues it was significant and supported his alleged neck, back,

10  and hip pain.  (ECF No. 19 at 8–9.)  However, the fact that Plaintiff has received injections for

11  pain does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment as a whole

12  was conservative.  See Agatucci v. Berryhill, 721 F. App'x 614, 618 (9th Cir. 2017) ("We uphold

13  [the] ALJ's rational interpretation that, because [plaintiff's] condition did not necessitate surgery,

14  her symptoms were not as debilitating as she alleged.") (citing Parra, 481 F.3d at 751); see also

15  Martin v. Colvin, No. 1:15-cv-01678-SKO, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017)

16  ("[T]he fact that Plaintiff has been prescribed narcotic medication or received injections does not

17  negate the reasonableness of the ALJ's finding that Plaintiff's treatment as a whole was

18  conservative, particularly when undertaken in addition to other, less invasive treatment

19  methods."); Zaldana v. Colvin, No. CV 13-7820 RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct.

20  1, 2014) (finding that evidence of treatment including Tramadol, ibuprofen, and "multiple steroid

21  injections" was a legally sufficient reason on which the ALJ could properly rely in support of his

22  adverse credibility determination); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL

23  1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations

24  based on conservative treatment consisting of Vicodin, physical therapy, and an injection).

25  Moreover, Plaintiff acknowledges the fact he has not undergone spinal surgery, which would not

26  be characterized as conservative.  (See ECF No. 19 at 9.)

27        On this record, the Court finds the ALJ's characterization of Plaintiff's treatment as

28  inconsistent with the severity of his alleged symptoms is supported by the record.  See Burch, 400

F.3d at 679 (where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld).  As such, this was an appropriate and sufficient basis for the ALJ's credibility determination.

### c.   Medications Were Effective

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ noted Plaintiff reported medications were effective at limiting his pain to a two or a three on a ten-point scale, and there was no documentation of limiting side effects.  (AR 27.)  Plaintiff disputes this finding, arguing that it ignores conflicting evidence that Plaintiff reported his worst pain as a seven or nine and allegations that the pain medications were only effective in limiting Plaintiff's pain for a couple of hours.  (ECF No. 19 at 10.)  Further, Plaintiff argues the finding is undermined by the evidence that Plaintiff required injections in addition to medications.  (Id.)

Plaintiff again mischaracterizes the evidence.  According to the medical record, Plaintiff reported that taking medications reduced his pain from what was generally a five or six on a scale of ten — at worst, a seven or nine — to a two or three.  (See AR 413–18, 433–39, 559–64, 576–83, 589–99, 605–09, 614–18, 624–33.)  Indeed, specifically with respect to his Norco prescription, Plaintiff "report[ed] significant pain relief."  (See AR 559–83.)  This contradicts Plaintiff's later testimony at the hearing and supports the ALJ's discounting of Plaintiff's pain testimony.

The Court finds Plaintiff's nerve block and steroidal injections argument is also unavailing.  Determining the efficacy of treatment need not rely solely on evidence of medications to the exclusion of Plaintiff's nerve blocks and injections.  As the Court previously determined, Plaintiff's treatment as a whole was conservative, and the ALJ found that Plaintiff's treatment reduced his pain to a two or three out of ten.  Because this finding in the medical record contradicts Plaintiff's later testimony, the ALJ's discounting of Plaintiff's pain testimony is supported.

1       **d.**    **Poor Work History**

2       Finally, Plaintiff argues the ALJ erred in determining the periods of unemployment and

3   underemployment in Plaintiff's work record cut against his credibility because Social Security

4   Ruling 16-3 prohibits an ALJ from assessing an individual's overall character or truthfulness.[23]

5   (ECF No. 19 at 10–11.)  Not so.

6       Pursuant to 20 C.F.R. § 404.1529, an ALJ may consider a claimant's "efforts to work" in

7   assessing credibility.   See 20 C.F.R. §§ 404.1529(c)(1), (3)("In evaluating the intensity and

8   persistence of your symptoms, we consider all of the available evidence from your medical

9   sources and nonmedical sources about how your symptoms affect you . . . including information

10  about your prior work record"); see also Thomas v. Barnhart, 278 F.3d at 959.   Thus, the ALJ

11  properly considered Plaintiff's work history.  Further, the ALJ correctly determined Plaintiff had

12  a poor overall work record, based on evidence that Plaintiff reported no income from 1995

13  through 2006 and during 2009, 2010, and 2013; reported income below the presumptive

14  substantial gainful activity threshold during 2007, 2010, 2012, and 2014; and stopped working in

15  2015 for reasons unrelated to his alleged impairments.  (AR 27, 47, 58, 235–47.)  Based on this

16  record, the ALJ properly determined Plaintiff's work history undercut his claims of disability and

17  therefore discounted Plaintiff's testimony.

18      5.   Ruling: the ALJ Provided Sufficient Reasons to Discount Plaintiff's Testimony

19      For the foregoing reasons, the Court finds the ALJ provided four sufficient reasons for

20  discounting Plaintiff's subjective pain testimony.  Furthermore, even if one of the reasons offered

21  for discounting Plaintiff's testimony was erroneous, there is no indication of harmful error

22  because of the many valid reasons supported by the record.  See Owen v. Saul, 808 F. App'x 421,

23  423 (9th Cir. 2020).

24  

---

25  [23] The Court notes Plaintiff contests the ALJ's findings with respect to his work record, but does not discuss the
    ALJ's findings regarding his daily living activities.  With respect to Plaintiff's activities of daily living, the ALJ also

26  found the record did not establish a reasonable basis for the extreme limitations Plaintiff alleged.  Rather, the ALJ
    concluded that, to the extent that Plaintiff's activities of daily living are limited, it was likely due primarily to non-

27  disability factors, such as lifestyle choice, rather than being the necessary consequence of Plaintiff's impairments.
    (AR 27.)  This conclusion is also supported by the medical record, based on Dr. Villalvazo and Dr. Poonia's repeated
    attempts to counsel Plaintiff on the importance of eating a nutritious healthy food diet on a regular basis and getting

28  at least a few hours each week of moderate aerobic exercise.  (See, e.g., AR 388–400, 477–96, 499–29.)

**B.**   **Whether the ALJ Sufficiently Developed the Medical Opinion Evidence of Record**

1.   <u>Parties' Arguments</u>

Plaintiff contends the ALJ failed to fully develop the record with respect to medical opinion evidence regarding the extent of Plaintiff's physical limitations.  (ECF No. 19 at 12–13.) Plaintiff argues the State agency doctors who provided medical opinions in May and July 2018 did not review or opine as to Plaintiff's treatment with Dr. Ky through 2019; therefore, there was no reliable or recent medical source opinion from which the ALJ could base his finding. Consequently, Plaintiff argues the ALJ had a duty to further develop the record by ordering a consultative examination or consulting with a medical expert at the administrative hearing. Instead, the ALJ improperly rendered his own medical opinion to conclude Plaintiff could frequently handle and finger, perform occasional postural activities, and stand or walk for two hours in an eight-hour workday.

In opposition, Defendant argues Plaintiff misconstrues the ALJ's role as factfinder and misapplies the duty to develop doctrine, which only applies to inadequate or ambiguous records and is not triggered merely by the ALJ rejecting or discounting the state agency examiners' opinions.  (ECF No. 21 at 9–11.)  Further, Defendant argues the subsequent record was more consistent with sedentary work and therefore supported the ALJ's partial reliance on the prior administrative medical findings.  (ECF No. 21 at 12.)  The Court finds Defendant has the better argument.

2.   <u>Discussion</u>

The regulations are clear: the final responsibility for deciding RFC is reserved to the Commissioner:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s).  Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity (see §§ 416.945 and 416.946), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner

20 C.F.R. § 416.927(d)(2); <u>see also</u> <u>Vertigan</u>, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.") (citing 20 C.F.R. § 404.1545); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) *if necessary* . . .") (emphasis added, internal citation omitted); <u>Schott v. Comm'r of Soc. Sec. Admin.</u>, No. CV-19-00389-PHX-JJT, 2019 WL 5782324, at *5 (D. Ariz. Nov. 6, 2019) (rejecting plaintiff's contention that the ALJ was not qualified to "provide an independent analysis of medical evidence, that is, decide on her own that there were insufficient findings in this record to support the treating physician's opinion," on the basis that "it is precisely the ALJ's job to determine the weight to give a medical opinion").

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.' " <u>Celaya v. Halter</u>, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting <u>Brown v. Heckler</u>, 713 F.2d 441, 443 (9th Cir. 1983)).

> The ALJ is not a mere umpire at such a proceeding . . . : it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.

<u>Id.</u> (quoting <u>Higbee v. Sullivan</u>, 975 F.2d 558, 561 (9th Cir. 1992)).

However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." <u>Mayes v. Massanari</u>, 276 F.3d 453, 459–60 (9th Cir. 2001); <u>see also</u> <u>Brown</u>, 697 F. App'x at 549 ("Because the record evidence was not ambiguous and the record was sufficient to allow for proper evaluation of the evidence, the ALJ was not required to re-contact Brown's doctors or further develop the record . . . [and] the ALJ provided specific, clear and convincing reasons for finding Brown's testimony regarding his symptom severity was not fully credible, including that Brown's testimony was inconsistent with his daily activities.").

1    Neither of the aforementioned circumstances appears here, nor does Plaintiff make this

2    argument.  Rather, the Court finds the record was adequate to enable the ALJ to evaluate the

3    evidence concerning the severity of Plaintiff's symptoms.  See, e.g., Agatucci, 721 F. App'x at

4    618.  Indeed, the Court finds the instant case analogous to Bufkin v. Saul, in which the Ninth

5    Circuit expressly upheld the ALJ's RFC finding based on later-developed medical records.

6    Bufkin, 836 F. App'x 578, 579 (9th Cir. 2021) ("Contrary to Bufkin's argument, the ALJ did not

7    rely on her "lay interpretation" of medical evidence.  Rather, the ALJ simply summarized the

8    medical evidence from Dr. Parminder and Dr. Emlein; she did not interpret any x-rays or test

9    results directly.  ALJs need not seek the opinion of a medical expert every time they review new

10   medical evidence and make a[n] RFC determination."); see also 20 C.F.R. § 404.945(a) (there is

11   no requirement that the RFC mirror any specific medical opinion).

12   Furthermore, "[w]here the evidence is susceptible to more than one rational interpretation,

13   it is the ALJ's conclusion that must be upheld."  Morgan v. Comm'r of Soc. Sec. Admin., 169

14   F.3d 595, 599 (9th Cir. 1999).

15   ///

16       3.    Ruling:

17   In sum, the Court finds the ALJ's interpretation of the medical evidence is reasonable, the

18   ALJ's partial reliance on the prior administrative medical findings is supported, and thus the RFC

19   is supported by substantial evidence in the record.  Accordingly, the Court will not disturb the

20   ALJ's decision.

21                                        **V.**

22                          **CONCLUSION AND ORDER**

23   Based on the foregoing, the Court finds that the ALJ sufficiently provided clear and

24   convincing reasons for discounting Plaintiff's testimony, did not have a duty to further develop

25   the record, and did not commit error in determining the Residual Functional Capacity.  The Court

26   finds the ALJ's decision to be supported by substantial evidence in the administrative record, and

27   free from remandable legal error.

28   Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Bart Henlsey.  The Clerk of the Court is DIRECTED to CLOSE this action.

IT IS SO ORDERED.

Dated:   **February 28, 2022**

UNITED STATES MAGISTRATE JUDGE